## ROYAL BAKING POWDER CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Second Circuit. May 1, 1922.)

No. 263.

1. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series—Federal Trade Commission's finding, supported by evidence, conclusive.

Under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k) findings of the Trade Commission, supported by testimony, are conclusive.

2. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series—Federal Trade Commission's finding of unfair competition in misleading public into thinking present product same as product formerly sold held supported by evidence.

Where, due to the increased cost of cream of tartar, defendant discontinued manufacturing its widely advertised brand of cream of tartar baking powder, which had been on the market for 60 years, and began to manufacture a phosphate baking powder and advertised it for sale at about one-half the former price under practically the same trade-name and put up in similar containers, the Trade Commission's findings that this method was misleading to the public and unfair to other manufacturers selling cream of tartar baking powder was justified by the evidence.

3. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series—Misleading public by false labeling and advertisements held unfair method of competition.

Where a manufacturer, by employing false and misleading labeling and advertising, induced the public to believe that a phosphate baking powder which it was manufacturing was the same as a more expensive cream of tartar baking powder which it had formerly manufactured, this misrepresentation was an "unfair method of competition," which can be prevented by the Trade Commission, under Act Sept. 26, 1914, § 5 (Comp. St. § 8836e).

Petition to Review Order of the Federal Trade Commission.

Petition by the Royal Baking Powder Company to revise an order of the Federal Trade Commission. Order affirmed.

Moore, Hall, Swan & Cunningham, of New York City (William A. Moore and John H. Jackson, both of New York City, of counsel), for petitioner.

W. H. Fuller, Chief Counsel Federal Trade Commission, and James T. Clark, both of Washington, D. C., for respondent.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The Congress has passed what is known as the Federal Trade Commission Act. This act was approved on

September 26, 1914, 38 Stat. c. 311, p. 717 (Comp. St. §§ 8836a–8836k). The act authorized the creation of the Federal Trade Commission, to be composed of five commissioners, to be appointed by the President with the advice and consent of the Senate. It declares that unfair methods of competition in commerce are unlawful. The commission is empowered and directed to prevent persons, partnerships, or corporations, except banks and common carriers, from using unfair methods of competition in commerce.

The constitutionality of this act was challenged in Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed. 307, 169 C. C. A. 323, 6 A. L. R. 358. The act invests the commission with certain quasi legislative and quasi judicial power, and it was argued that there was an unlawful delegation both of legislative and judicial power. The Circuit Court of Appeals in the Seventh Circuit in the above-named case had no difficulty in sustaining the validity of the statute, and it pointed out that grants of similar authority to administrative officers and bodies had not been found repugnant to the Constitution, citing cases. In the cases which have been heretofore before us no attempt has been made to deny the validity of the act, and its validity is not questioned in the case now before us.

The Federal Trade Commission on February 4, 1920, caused a complaint to be issued against the Royal Baking Powder Company, a corporation organized under the laws of the state of New Jersey. The Royal Baking Powder Company, hereinafter referred to as the petitioner, is engaged in manufacturing and selling in interstate commerce, and in competition with many other concerns similarly engaged, baking powders not only under its own name, but in the name of its constituent companies, and particularly the Price Baking Powder Company, which was one of four pre-existing corporations with which it was consolidated.

The complaint alleges that the petitioner is engaged in violating the provisions of section 5 of the Act of Congress approved September 26, 1914. 38 Stat. 717. That is the act which created the Federal Trade Commission and defined its powers and duties. The petitioner in due time filed its answer and testimony was taken, and after oral argument before the commission the commission made its findings and issued the order which we are now asked to review.

Section 5 of the act (Comp. St. § 8836e) among other things declared:

"That unfair methods of competition in commerce are hereby declared unlawful. The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the acts to regulate commerce, from using unfair methods of competition in commerce."

The commission in carrying into effect the provisions of the act is authorized to institute proceedings against those it has reason to believe are violating the terms of the statute. The proceedings which the commission is authorized to institute are not punitive, and no form of punishment is provided. It is not intended that compensation is to be made for any injuries which may have been suffered. The intent of the act is the prevention of injury to the general public. What

the commission is created to deal with is, not acts of unfair competition, but the use of unfair methods of competition.

[1] The act provides that, if at the hearing the commission is of the opinion that the method of competition in question is prohibited by the act, it shall make a report in writing in which it shall state its findings as to the facts, and that it shall issue an order requiring the person, partnership, or corporation found to be engaged in such unfair method "to cease and desist from using such method of competition," and the act also provides that in any application to this court, either to enforce the order, or to affirm, set aside, or modify it:

"The findings of the commission as to the facts, if supported by testimony, shall be conclusive."

The transcript of record which in this case has been filed in this court contains voluminous findings made by the commission, covering 20 printed pages. These findings seem to us to be supported by the testimony, and they are therefore to be accepted and treated as conclusive.

[2] The length of the findings makes it undesirable to incorporate them herein ipsissimis verbis, and we are compelled to confine ourselves to a statement of the substance thereof. From the findings as made it appears that the petitioner has been engaged since its organization in 1899 in the manufacture of baking powders and in their sale and shipment in interstate and foreign commerce. In 1899 it acquired the entire capital stock of the Price Baking Powder Company, the Cleveland Baking Powder Company, and a former corporation also known as Royal Baking Powder Company. The baking powder manufactured by the Price Baking Powder Company was known as "Dr. Price's Cream Baking Powder." The Cleveland Company manufactured the "Cleveland Superior Baking Powder," and the former Royal Baking Powder Company the "Royal Baking Powder." And after the petitioner acquired the stock of these companies it continued the manufacture and sale of these three brands of powder. From 1899 to 1917 it had sold "Dr. Price's Cream Baking Powder" under the name of the Price Baking Powder Company, but in 1917 and thereafter, up to September, 1919, it manufactured and sold it under its own name.

Baking powder consists of (1) a carbonate, usually bicarbonate of soda, mixed with (2) an acid ingredient capable of reacting with the alkaline carbonate, when moistened, and setting free carbonic acid gas, which gas raises the dough, and (3) a filler, usually flour or corn starch, which tends to prevent any premature reaction caused by the moisture in the air. The baking powder known as "Dr. Price's Cream Baking Powder" was originated in 1853 by Dr. Vincent C. Price, a physician, and was manufactured by him, and by various firms of which he was a member, up to 1884, when the Price Baking Powder Company acquired the business and continued the manufacture and sale of said baking powder until the business was taken over by the petitioner, and during all of said time and until September, 1919, the said baking powder was a cream of tartar baking powder, and

was advertised and sold exclusively as such.  Dr. Price never manufactured a phosphate baking powder.

For a period of over 60 years prior to September, 1919, the "Dr. Price's Cream Baking Powder" had been marketed and advertised exclusively as a cream of tartar baking powder, and for at least 35 years (1884–1919) the petitioner and its predecessor, the Price Baking Powder Company, carried on an extensive advertising campaign, throughout 22 states in the middle and western sections of the country, to establish in the minds of consumers the superiority, especially from the point of view of healthfulness, of its cream of tartar baking powder, and the inferiority of the baking powders manufactured and sold by competitors and containing phosphate or alum, or both, as their acid ingredients, which competing powders were represented by the petitioner to be unwholesome and deleterious.

Through circulars, pamphlets, cook books, newspapers, and other forms of advertising, the petitioner for many years prior to September, 1919, warned the purchasing public against the use of phosphate baking powders, and asserted that cream of tartar was the only acid ingredient which should be used in baking powder.  It emphasized the wholesomeness and food value of cream of tartar, and maintained that phosphate was unwholesome and dangerous as an ingredient, was produced either by dissolving bones in oil of vitriol, or from rocks formed by the action of the excreta of birds and animals on limestone.  It referred to phosphate as "bone acid" or "lime phosphate," and alleged that it was of purely mineral origin, left objectionable mineral residues in the food, and many other statements to the same or similar effect.  It further asserted that it had never manufactured any but exclusively cream of tartar powders, that no cream of tartar baking powder ever contained phosphate, and that no phosphate powder ever contained cream of tartar.

By means of such advertising the petitioner was able to sell large quantities of its cream of tartar baking powder, under the name "Dr. Price's Cream Baking Powder," in competition with phosphate baking powders and alum baking powders selling for about one-half and one-fourth, respectively, of the selling price of petitioner's said cream of tartar baking powder.  The petitioner continued up to May 28, 1919, to publish and circulate disparaging advertisements concerning baking powders containing such phosphate.

In July, 1919, because of the scarcity and increased cost of cream of tartar, respondent determined to change Dr. Price's Cream Baking Powder, which had been well known for 60 years as a cream of tartar baking powder, to a phosphate powder, and to conserve the available supply of cream of tartar for its other brands.  Cream of tartar had increased in price until at that time it cost more than five times as much as phosphate.  In a "news item for trade papers" petitioner asserted that, in view of the high cost and scarcity of cream of tartar, the growing demand for a pure baking powder at a low price, and recent scientific developments in phosphate which permitted the manufacture of a pure high-grade phosphate baking powder containing no deleterious or objectionable substances at a very much lower price,

it had decided to change its well-known Dr. Price brand from a cream of tartar powder to a straight phosphate baking powder, to be sold at approximately one-half its former price, after November 1, 1919.

The petitioner began the manufacture of said phosphate powder in September, 1919, and put the same on the market about the middle of November, 1919, in the states of Illinois, Wisconsin, Missouri, and part of Kansas. The label on the new goods was the same as had been previously used on the cream of tartar powder, except that a small circular "World's Fair Award" sticker was omitted from the front panel, and a clause headed "A Pure Phosphate Powder" was printed in red diagonally across the back panel, giving as the new ingredients, "Bicarbonate of Soda, Phosphate, Cornstarch." There was retained on this label the declaration in heavy black type, more conspicuous than the red overprint, that the powder contained "Pure Grape Cream of Tartar, Tartaric Acid."

In August, 1919, the petitioner ordered 18,000,000 new labels printed, to be used as the permanent label for the new phosphate baking powder. All of the distinctive features of the old cream of tartar labels were retained on these new labels, including the name "Dr. Price's," which had been advertised for many years as denoting exclusively a cream of tartar powder and not a phosphate powder. Quotation marks were placed around the word "Cream," registered as a trade-mark by petitioner, and the design of a cornucopia containing clusters of grapes was modified by changing the grapes to flowers, but retaining the general contour. At the bottom of the front panel the legend "Perfectly Pure" was replaced by the words "A Pure Phosphate Powder" in the same size of type, and the words "Standard for 60 years" became "Makers for 60 years," and various other minor changes were made.

These new permanent labels, the commission found, were so like the labels previously used by petitioner on the cream of tartar powder in arrangement of lettering and design, in coloration and general appearance, as to cause the one to be mistaken for the other, and to confuse and mislead purchasers familiar with the former product as to the character of the contents of the new cans. In its efforts to avoid, as far as possible, any striking modification of the general appearances of the containers, respondent caused the bottom of the new cans to be forced up to make allowance for the smaller bulk of the phosphate goods. The petitioner's president regarded any change in the general appearance or coloration of the label inadvisable.

At the time the new phosphate powder was first put on the market, the petitioner began an advertising campaign in newspapers, trade journals, and on billboards, window posters, card displays, and motion picture films. In these advertisements the fact that the new powder was to be offered to the public at about one-half of the former price was given emphasis. In some instances the advertisements failed to make any mention whatever of the change from cream of tartar to phosphate as the acid ingredient. In others a reference was

made in the body of the advertisement to the use of "new methods of production with pure phosphate." No mention of phosphate appeared in the headings of any of the advertisements prior to the beginning of the proceeding before the commission, except that three of the advertisements bore the caption "The 'Cream' of Phosphate Baking Powders."

The following are examples, which might easily be multiplied, of respondent's advertisements of the new powder which contained no mention of phosphate:

"What One Neighbor

"Told Another

"Have you heard the good news?
"The price of Dr. Price's Baking Powder has been reduced nearly one-half. When the grocer told me, I just threw away that alum mixture I have been using, and ordered a can of

"Dr. Price's

"Baking Powder.

"A name famous for 60 years is a guarantee of quality," etc.

Again:

"Don't Increase
"The High Cost of Living
"By spending your shrunken dollar and risking your health, for doubtful baking powders when you can now get

"Dr. Price's

"Baking Powder.

"At about one-half the former cost
"A name famous for 60 years assures quality and dependability."

Again:

"Putting More in the

"Market Basket

"The greatly reduced price of Dr. Price's Baking Powder enables you to put more good things in your market basket. The saving will help pay for the flour and other things you put in your cakes, and besides you are assured of the wholesomeness of

"Dr. Price's

"Baking Powder.

"A name famous for quality for 60 years."

In addition the petitioner used, for advertising purposes, bill board posters and motion picture slides which tended to create the belief on the part of the public that the new powder which it was placing on the market was in fact Price's Baking Powder, which had been well known for 60 years as a cream of tartar powder, and to conceal or obscure the fact that it was a radically different powder.

The commission found that the advertising was false and misleading, in representing to the public that the price of said new phosphate baking powder had been reduced to about one-half its former cost, when in fact the price of said powder had been at all times the same; and petitioner's use on a phosphate baking powder of a brand which had by its own efforts become identified exclusively with a cream of

tartar powder, as opposed to a phosphate powder, which latter type of powders respondent had for many years denounced as undesirable and unhealthful, was calculated and designed to deceive and did deceive the public, and especially such part of the public as was accustomed to obtain a pure cream of tartar baking powder under the well-known brand "Dr. Price's Baking Powder."

The commission also found that petitioner's said advertising and its said conduct in using said well-recognized brand or name upon a phosphate baking powder tended, under the circumstances hereinbefore set forth, unfairly to hinder and obstruct the business of respondent's competitors engaged in manufacturing and selling cream of tartar baking powder, at their normal prices which were approximately double the prices asked by respondent for said phosphate powder. The commission further found that the petitioner's method of advertising and branding also tended unfairly to hinder and obstruct the business of respondent's competitors engaged in the manufacture and sale of phosphate baking powders in competition with said phosphate baking powder of respondent, selling at an alleged reduced price under a name used for 60 years on an exclusively cream of tartar powder.

The commission therefore declared that the petitioner was using unfair methods of competition in interstate and foreign commerce in violation of the act of September 26, 1914. It thereupon issued its order directing the petitioner to cease and desist from:

"1. Using on the new phosphate baking powder manufactured by it the so-called 'overprint label' or the so-called 'new label' heretofore used by it, or any label simulating or resembling in coloration, design, or general appearance the labels formerly used by respondent on its 'Dr. Price's' brand of cream of tartar baking powder.

"2. Selling, or advertising for sale, said phosphate baking powder under the name 'Dr. Price's' or 'Price's' unless the word 'cream' is omitted, and the word 'phosphate' is incorporated as part of the name of said baking powder, on the labels thereof and in the advertisements relating thereto.

"3. Advertising or representing, in connection with the sale of said phosphate baking powder, that respondent's 'Dr. Price's' cream of tartar brand of baking powder has been reduced in price.

"4. Representing, by advertising or otherwise, that said phosphate baking powder is the baking powder sold by respondent for many years under its 'Dr. Price's' brand."

As this court is satisfied, upon a careful examination of the transcript, that the findings are amply justified by the evidence, the sole question left for us to determine is whether the order is one within the jurisdiction of the commission and therefore valid.

[3] The petitioner contends that misrepresentation of the quality or ingredients of one's own goods is not "an unfair method of competition," within the meaning of the Federal Trade Commission Act. Counsel for the petitioner argues that no statute or decided case has declared that a manufacturer or trader owes to his competitors the duty of refraining from misrepresentation of the quality or ingredients of his own goods, and that, on the contrary, it has been firmly held that no such duty exists; and it is said that in making the order now under review the commission assumed, not only to create a new

rule of substantive law, but to destroy one of long standing and universal acceptance. And our attention is called to the following cases in support of the above contention: American Washboard Co. v. Saginaw Mfg. Co., 103 Fed. 281, 43 C. C. A. 233, 50 L. R. A. 609; Borden's Condensed Milk Co. v. Horlick's Malted Milk Co. (D. C.) 206 Fed. 949; Armstrong Cork Co. v. Ringwalt Linoleum Co. (D. C.) 235 Fed. 458. The first two of those three cases were decided prior to the enactment of the statute which created the Federal Trade Commission and defined its powers. The third case is a decision of the District Court of New Jersey and contains no reference to the statute creating the Federal Trade Commission. It was decided upon the authority of the American Washboard Co. Case, which it followed, and which we shall refer to more fully in a moment. In the District Court the defendant moved to dismiss the bill under equity rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), on the ground that it did not state facts sufficient to constitute a cause of action. The motion was granted, and the case was taken to the Circuit Court of Appeals for the Third Circuit and there reversed, without, however, any expression of opinion upon the merits. That court remanded the case, with the direction to reinstate the bill, overrule the demurrer, and proceed to final hearing, without prejudice to the right to raise the question as to the sufficiency of the bill. The court added:

"We might add that, in view of the possibility of bringing such matters as are here involved before the Federal Trade Commission, this order is made without prejudice to the right of the parties, while this appeal is pending, to apply for relief to that body, if it so desires." Armstrong Cork Co. v. Ringwalt Linoleum Works, 240 Fed. 1022, 153 C. C. A. 665.

Afterwards the matter was brought before the Federal Trade Commission, and an order was made by it to cease and desist from using the word "linoleum," and from such order no appeal was taken.

In the American Washboard Co. Case the complainant was the manufacturer of a washboard having the rubbing face made of aluminum and upon which it used the word "Aluminum" as a trademark. It was the only manufacturer of such boards in the country, having secured a monopoly of all the sheet aluminum produced which was suitable for use in their manufacture. The bill, which asked for an injunction, alleged that the defendant had placed on the market a washboard on which it used the word "Aluminum," by reason of which the public was deceived into buying it as a genuine aluminum washboard, although there was none of that metal in its composition. The Circuit Court of Appeals for the Sixth Circuit, then composed of Judges Taft, Lurton, and Day, each of whom later became a member of the Supreme Court, held that the facts alleged did not entitle the complainant to relief, since it was not shown that purchasers bought defendant's boards in the belief that they were made by complainant. In the course of the opinion, which was written by Judge Day, he said:

"Can it be that a dealer, who should make such articles only of pure wool, could invoke the equitable jurisdiction of the courts to suppress the trade and business of all persons whose goods may deceive the public? We find

no such authority in the books, and are clear in the opinion that, if the doctrine is to be thus extended, and all persons compelled to deal solely in goods which are exactly what they are repr· sented to be, the remedy must come from the Legislature, and not from the courts."

The above case illustrates one of the reasons which led Congress to enact the statute creating the Federal Trade Commission, and making unfair methods of competition unlawful, and empowering the commission to put an end to them. By that statute the identical situation which the court in the above case said it was beyond its power to suppress has been brought within the jurisdiction of the Federal Trade Commission—created to redress unfair methods of competition. Before the enactment of the Federal Trade Commission Act the courts appear to have had jurisdiction of an action for unfair competition only when a property right of the complainant had been invaded. But the Federal Trade Commission Act gave authority to the commission itself when it had reason to believe that any person, partnership, or corporation was using any unfair method of competition in commerce, if it appeared to it that a proceeding by it in respect thereof "would be to the interest of the public" to bring such offending party before it to answer to its complaint and after a hearing could, upon good cause shown, require it to cease and desist from its unlawful methods.

The answer to the contention of the counsel for the petitioner is found in a recent decision of the Supreme Court, Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. ——, 42 Sup. Ct. 384, 66 L. Ed. ——, which has not yet been [officially] published. In Winsted Hosiery Co. v. Federal Trade Commission, 272 Fed. 957, this court had before it the method of an underwear manufacturing company of branding its products as wool, merino, etc., when in fact they were composed only partly of wool or merino. A great deal of testimony had been taken which this court thought fully established that the trade was not misled in any respect by the label complained of. But some witnesses testified that in their opinion some part of the consuming public was or might be misled into thinking the underwear so described was pure wool. It also appeared that the method of branding which this manufacturer pursued was in accord with the general custom and practice of the underwear trade throughout the United States, and was well known to and recognized by the distributors of underwear in this country. We therefore held that the order of the Federal Trade Commission, requiring the particular manufacturer to desist from such methods, was error, and did not constitute unfair competition. The reversal of the case by the Supreme Court (Federal Trade Commission v. Winsted Hosiery Co., supra) has established the principle that advertisements which are false in fact constitute an unfair method of competition, although it was one commonly practiced and not intended to mislead the trade. The labeling of commodities in such a way as to deceive the public is an unfair method of competition. The manufacturer must not brand his goods as "wool" when they are part wool and part cotton; and it is now made plain that the statute has invested the commission with

jurisdiction to order any one who misrepresents the quality of his goods in his advertising to cease and desist from such unfair methods of competition.

In the case now before the court the commission was convinced, and, as we have said, its opinion was justified by the evidence, that the petitioner, in the use of its labels and otherwise, was employing false and misleading advertising, which was calculated and designed to deceive the public, and which did deceive the public, into buying a phosphate baking power believing that it was the Dr. Price's Baking Powder which had been well known for 60 years as a cream of tartar powder, concealing and obscuring the fact that it was a radically different powder. The case is plainly governed by the principle laid down in the Winsted Hosiery Co. Case.

The novelty of the present case lies in the fact that the manufacturer is passing off one of his products for another of his own products and the basis of this proceeding is the deception of the public. In Sears, Roebuck & Co. v. Federal Trade Commission, supra, decided in 1919, the commission had entered an order commanding a mail order house to desist from circulating catalogues containing advertisements falsely representing to the public that, because of its large purchasing power and quick moving stock, it was able to sell sugar at a price lower than its competitors. Manifestly such advertisements tended to injure competitors and to deceive purchasers, and the commission's order was sustained, although it was subjected to verbal modification.

The difference in principle between that case and the one now before us is, at best, simply one of degree. The method of advertising adopted by the Royal Baking Powder Company to sell under the name of Dr. Price's Cream Baking Powder an inferior powder, on the strength of the reputation attained through 60 years of its manufacture and sale and wide advertising of its superior powder, under an impression induced by its advertisements that the product purchased was the same in kind and as superior as that which had been so long manufactured by it, was unfair alike to the public and to the competitors in the baking powder business. The purpose of the Congress in creating the Federal Trade Commission was aimed at just such dishonest practices, and business concerns that resort to dishonest devices of this nature must understand that they cannot add to their revenue or maintain their business standing by methods of competition which the law brands as "unfair" and therefore unlawful.

The order of the commission is affirmed.