**WARNER–LAMBERT COMPANY,**
**Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 76–1138.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 25, 1977.

Decided Aug. 2, 1977.

Rehearing Denied Sept. 14, 1977.

Herbert A. Bergson, Washington, D. C., with whom James H. Kelley, Donald L. Hardison, and Larry D. Sharp, Washington, D. C., were on the brief, for petitioner.

Jerold D. Cummins, Acting Asst. Gen. Counsel, F. T. C., Washington, D. C., with whom Gerald P. Norton, Acting Gen. Counsel, F. T. C., Washington, D. C., was on the brief, for respondent. Gerald Harwood, Asst. Gen. Counsel, F. T. C., Washington, D. C., at the time the record was filed, also entered an appearance for respondent.

Gilbert H. Weil, New York City, filed a brief on behalf of the Association of National Advertisers, Inc. as amicus curiae urging reversal.

William W. Rogal, Washington, D. C., filed a brief on behalf of the American Advertising Federation as amicus curiae urging reversal.

Before BAZELON, Chief Judge, and WRIGHT and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

Dissenting opinion filed by ROBB, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

The Warner-Lambert Company petitions for review of an order of the Federal Trade Commission requiring it to cease and desist from advertising that its product, Listerine Antiseptic mouthwash, prevents, cures, or alleviates the common cold. The FTC order further requires Warner-Lambert to disclose in future Listerine advertisements that: "Contrary to prior advertising, Listerine will not help prevent colds or sore throats or lessen their severity."[1] We affirm but modify the order to delete from the required disclosure the phrase "Contrary to prior advertising."

## I. BACKGROUND

The order under review represents the culmination of a proceeding begun in 1972, when the FTC issued a complaint charging petitioner with violation of Section 5(a)(1) of the Federal Trade Commission Act[2] by misrepresenting the efficacy of Listerine against the common cold.

Listerine has been on the market since 1879. Its formula has never changed. Ever since its introduction it has been represented as being beneficial in certain respects for colds, cold symptoms, and sore throats. Direct advertising to the consumer, including the cold claims as well as others, began in 1921.

Following the 1972 complaint, hearings were held before an administrative law judge (ALJ). The hearings consumed over four months and produced an evidentiary record consisting of approximately 4,000 pages of documentary exhibits and the testimony of 46 witnesses. In 1974 the ALJ issued an initial decision sustaining the allegations of the complaint. Petitioner appealed this decision to the Commission. On December 9, 1975 the Commission issued its decision essentially affirming the ALJ's

---

1. This requirement terminates when petitioner has expended on Listerine advertising a sum equal to the average annual Listerine advertising budget for the period of April 1962 to March 1972, approximately ten million dollars.

2. 15 U.S.C. § 45(a)(1) (1970). At the time the complaint issued, § 5(a)(1) stated that "[u]nfair

methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." This was amended in 1975 to substitute "in or affecting commerce" for the phrase "in commerce." See 15 U.S.C. § 45(a)(1) (Supp. V 1975).

findings. It concluded that petitioner had made the challenged representations that Listerine will ameliorate, prevent, and cure colds and sore throats, and that these representations were false. Therefore the Commission ordered petitioner to:

(1) cease and desist from representing that Listerine will cure colds or sore throats, prevent colds or sore throats, or that users of Listerine will have fewer colds than non-users;[3]

(2) cease and desist from representing that Listerine is a treatment for, or will lessen the severity of, colds or sore throats; that it will have any significant beneficial effect on the symptoms of sore throats or any beneficial effect on symptoms of colds; or that the ability of Listerine to kill germs is of medical significance in the treatment of colds or sore throats or their symptoms;

(3) cease and desist from disseminating any advertisement for Listerine unless it is clearly and conspicuously disclosed in each such advertisement, in the exact language below, that: "Contrary to prior advertising, Listerine will not help prevent colds or sore throats or lessen their severity." This requirement extends only to the next ten million dollars of Listerine advertising.[4]

Petitioner seeks review of this order. The American Advertising Federation and the Association of National Advertisers have filed briefs as *amici curiae.*

## II. SUBSTANTIAL EVIDENCE

 The first issue on appeal is whether the Commission's conclusion that Listerine is not beneficial for colds or sore throats is supported by the evidence. The Commission's findings must be sustained if they are supported by substantial evidence on the record viewed as a whole.[5] We conclude that they are.

Both the ALJ and the Commission carefully analyzed the evidence. They gave full consideration to the studies submitted by petitioner. The ultimate conclusion that Listerine is not an effective cold remedy was based on six specific findings of fact.

First, the Commission found that the ingredients of Listerine are not present in sufficient quantities to have any therapeutic effect. This was the testimony of two leading pharmacologists called by Commission counsel. The Commission was justified in concluding that the testimony of Listerine's experts was not sufficiently persuasive to counter this testimony.[6]

Second, the Commission found that in the process of gargling it is impossible for Listerine to reach the critical areas of the body in medically significant concentration. The liquid is confined to the mouth chamber. Such vapors as might reach the nasal passage would not be in therapeutic concentration. Petitioner did not offer any evidence that vapors reached the affected areas in significant concentration.[7]

Third, the Commission found that even if significant quantities of the active ingredients of Listerine were to reach the critical sites where cold viruses enter and infect the body, they could not interfere with the activities of the virus because they could not penetrate the tissue cells.[8]

Fourth, the Commission discounted the results of a clinical study conducted by petitioner on which petitioner heavily relies. Petitioner contends that in a four-year study schoolchildren who gargled with Listerine had fewer colds and cold symptoms than those who did not gargle with Listerine. The Commission found that the design and execution of the "St. Barnabas study" made its results unreliable. For the first two years of the four-year test no placebo was given to the control group. For the last two years the placebo was

---

3. Petitioner does not contest this part of the order on appeal.

4. *See* note 1 *supra.*

5. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

6. JA 881–884, 909–921, 531–552.

7. JA 556–557.

8. JA 508–510, 533.

inadequate: the control group was given colored water which did not resemble Listerine in smell or taste. There was also evidence that the physician who examined the test subjects was not blinded [9] from knowing which children were using Listerine and which were not, that his evaluation of the cold symptoms of each child each day may have been imprecise, and that he necessarily relied on the non-blinded child's subjective reporting. Both the ALJ and the Commission analyzed the St. Barnabas study and the expert testimony about it in depth and were justified in concluding that its results are unreliable.[10]

Fifth, the Commission found that the ability of Listerine to kill germs by millions on contact is of no medical significance in the treatment of colds or sore throats. Expert testimony showed that bacteria in the oral cavity, the "germs" which Listerine purports to kill, do not cause colds and play no role in cold symptoms. Colds are caused by viruses. Further, "while Listerine kills millions of bacteria in the mouth, it also leaves millions. It is impossible to sterilize any area of the mouth, let alone the entire mouth."[11]

Sixth, the Commission found that Listerine has no significant beneficial effect on the symptoms of sore throat. The Commission recognized that gargling with Listerine could provide temporary relief from a sore throat by removing accumulated debris irritating the throat.[12] But this type of relief can also be obtained by gargling with salt water or even warm water.[13] The Commission found that this is not the significant relief promised by petitioner's advertisements. It was reasonable to conclude that "such temporary relief does not 'lessen the severity' of a sore throat any more than expectorating or blowing one's nose 'lessens the severity' of a cold."[14]

■ In its attack on the Commission's findings, petitioner relies heavily on a recent study of over-the-counter cold remedies by the Food and Drug Administration [15] which petitioner alleges found Listerine "likely to be effective."[16] Its argument is two-pronged: first, that the fact that the Commission's findings differ from the FDA's proves that the Commission's findings are wrong; and second, that it was error for the Commission to refuse to reopen its proceedings when the FDA study was released. We conclude that both of these arguments are without merit for the simple reason that the FDA study does not, to any significant degree, contradict the Commission's findings.

The FDA study is the product of an expert panel appointed in 1972 to study all over-the-counter cold, cough, allergy, bronchodilator, and anti-asthmatic drug products—some 180 ingredients used in as many as 50,000 products.[17] The panel's draft report was issued in February 1976, two months after the FTC issued its order

9. People who are given medication for an ailment frequently feel better because they think they should, even though the product has no therapeutic value. This is known as the placebo effect. In order to eliminate the bias of the placebo effect in a clinical study, it is common practice to "blind" the participants, i. e., dispense to the control group a placebo which simulates in taste, smell, and appearance the product being tested. Similarly, to neutralize any subconscious bias of the examiner, it is important to blind him, i. e., prevent him from knowing which subjects received the medication and which did not. A study in which both the subjects and the examiner are blinded is referred to as "double-blind." See JA 914–916.

10. JA 515–528, 913–920.

11. JA 879–881.

12. JA 876, 506.

13. Petitioner argued that the lower the surface tension of a gargle the greater its ability to remove the irritating debris, and there was evidence that Listerine has a lower surface tension than salt water. However, there was no evidence that this lower surface tension translates into meaningfully greater relief. JA 876.

14. Respondent's br. at 32 n.27.

15. Petitioner's motion requesting that the court take judicial notice of the FDA study is hereby granted.

16. See note 23 infra.

17. JA 3121–3129, 3280.

against Listerine. The FTC refused to reopen its proceedings to consider the draft report. In September 1976 the expert panel's report was published, but it has not yet been adopted by the Commissioner of the FDA.[18]

The only evidence pertinent to the effectiveness of Listerine that the FDA panel considered was the St. Barnabas study, and it appears that reference to it was included in the report only as an afterthought.[19] More importantly, the reference which does appear does not endorse or adopt the St. Barnabas study; the FDA report merely describes it and recounts the results.[20] The panel's own conclusions are reflected in the operative language repeated for each ingredient of Listerine:

> There are no well-controlled studies documenting the effectiveness of [eucalyptol/eucalyptus oil, menthol, thymol] as an [antitussive, expectorant, nasal decongestant].
>
> \* \* \* \* \* \*
>
> For use as a mouthwash: Data to demonstrate effectiveness will be required \* \* \* [21]

Each ingredient of Listerine was placed in Category III, defined as "the available data are insufficient to classify such condition under either [Category I, generally recognized as safe and effective] or [Category II, not generally recognized as safe and effective] and for which further testing is therefore required." [22] Petitioner's assertion that this is equivalent to finding the product "likely to be effective" is not supported by the facts.[23]

---

**18.** 41 Fed.Reg. 38312 (Sept. 9, 1976). The Commissioner stated: "The Commissioner has not yet fully evaluated the report, but has concluded that it should first be issued as a formal proposal to obtain full public comment before any decision is made on the recommendations of the Panel." *Id.*

**19.** The draft report published in February 1976 did not refer to mouthwashes or the St. Barnabas study. After it was issued the panel received a letter, apparently from petitioner, "concerning the fact that no references were made in the report on a submission concerning the use of volatile aromatics in mouthwashes for the symptomatic relief of the common cold." Minutes of the panel's meeting of March 2 and 3, 1976, JA 3045. The panel then voted to add to the sections of the report dealing with menthol, eucalyptol, and thymol (three of Listerine's active ingredients) a paragraph describing the St. Barnabas study. JA 3046.

**20.** The effect of rinsing and gargling twice daily with an aqueous mixture of volatile substances on the incidence of colds and the severity of the symptoms associated with colds was evaluated in a long-term double-blind, placebo-controlled, subjective study in school children. The results of the study revealed milder nasal symptoms and cough symptoms in individuals using the medicated mouthwash as compared to the placebo. Although the medicated mouthwash contained [eucalyptol, menthol, thymol], the results did not demonstrate the contribution of this component to the overall alleviation of symptoms \* \* \*.

**21.** 41 Fed.Reg. 38347–38349 (1976); *see also id.* at 38350–38351, 38353, 38361, 38364–38365, 38408–38411, 38413 (1976).

41 Fed.Reg. 38348 (1976); *see also id.* at 38351, 38353, 38409, 38411, 38413. To the extent that the report describes the St. Barnabas study as "double-blind, placebo-controlled," it appears to be in error. *See* text at notes 8–10 *supra.*

**22.** 21 C.F.R. § 330.10(a)(5)(iii) (1976).

**23.** The only place in the FDA report where the phrase "likely to be effective" appears is in the introduction to the report, where the panel outlines its duties. In an apparent reference to Category III, the panel lists as one task:

> Advising the Food and Drug Administration regarding those ingredients which in their judgment are likely to be safe and effective, but for which more data are needed.

41 Fed.Reg. at 38319. Petitioner concludes from this that every ingredient which the panel placed in Category III—including those in Listerine—was found "likely to be effective." This extrapolation is unwarranted. Every other reference to Category III in the report says simply "the available data are insufficient." *See, e. g., id.* at 38312, 38329, 38343, 38359, 38405. Similarly, the notation that data are insufficient is made for each ingredient of Listerine, *see* note 21, *supra,* while the phrase "likely to be effective" is never used in connection with any of them. We conclude that the panel put in Category III ingredients which were not proven effective or ineffective, in accordance with the mandate of 21 C.F.R. § 330.-10(a)(5)(iii), and that the phrase "likely to be effective" in the introduction was an aberration.

In sum, the FDA study does not reflect any new data not considered by the FTC. Since the FDA did not consider the extensive record compiled in the FTC proceedings, its conclusion that there is insufficient data about the ingredients of Listerine to justify classifying it as effective or ineffective is not necessarily inconsistent with the FTC's conclusion that Listerine's advertising claims are deceptive. The FTC did not err in refusing to reopen its proceedings to consider the draft FDA study, and the FDA findings do not establish that the FTC's conclusions are wrong.

## III. THE COMMISSION'S POWER

Petitioner contends that even if its advertising claims in the past were false, the portion of the Commission's order requiring "corrective advertising" exceeds the Commission's statutory power. The argument is based upon a literal reading of Section 5 of the Federal Trade Commission Act, which authorizes the Commission to issue "cease and desist" orders against violators and does not expressly mention any other remedies.[24] The Commission's position, on the other hand, is that the affirmative disclosure that Listerine will not prevent colds or lessen their severity is absolutely necessary to give effect to the prospective cease and desist order; a hundred years of false cold claims have built up a large reservoir of erroneous consumer belief which would persist, unless corrected, long after petitioner ceased making the claims.

█ The need for the corrective advertising remedy and its appropriateness in this case are important issues which we will explore *infra*. But the threshold question is whether the Commission has the authority to issue such an order.[25] We hold that it does.

Petitioner's narrow reading of Section 5 was at one time shared by the Supreme Court. In *FTC v. Eastman Kodak Co.* the Court held that the Commission's authority did not exceed that expressly conferred by statute. The Commission has not, the Court said, "been delegated the authority of a court of equity." [26]

But the modern view is very different. In 1963 the Court ruled that the Civil Aeronautics Board has authority to order divestiture in addition to ordering cessation of unfair methods of competition by air carriers.[27] The CAB statute, like Section 5, spoke only of the authority to issue cease and desist orders, but the Court said, "We do not read the Act so restrictively. * * [W]here the problem lies within the purview of the Board, * * * Congress must have intended to give it authority that was ample to deal with the evil at hand." The Court continued, "Authority to mold administrative decrees is indeed like the authority of courts to frame injunctive decrees * * *. [The] power to order divestiture need not be explicitly included in the powers of an administrative agency to be part of its arsenal of authority * * ." [28]

Later, in *FTC v. Dean Foods Co.,* the Court applied *Pan American* to the Federal Trade Commission.[29] In upholding the

---

24. Section 5(b) provides in pertinent part:

 If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by [this Act], it shall * * * issue * * an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice.

 15 U.S.C. § 45(b) (1970).

25. For reasons set forth below, we have decided to modify the Commission's order by deleting the phrase "Contrary to prior advertising." All of our discussion of the Commission's power refers to the order as modified.

26. 274 U.S. 619, 623, 47 S.Ct. 688, 689, 71 L.Ed. 1238 (1927) (setting aside order requiring Kodak to divest itself of three laboratories as part of unfair competition remedy).

27. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

28. *Id.* at 311–312 & 312 n.17, 83 S.Ct. at 486.

29. 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). The Court also noted that *Eastman Kodak* had been "repudiated" in *Pan American. Id.* at 606 n.4, 86 S.Ct. 1738.

Commission's power to seek a preliminary injunction against a proposed merger, the Court held that it was not necessary to find express statutory authority for the power. Rather, the Court concluded, "It would stultify congressional purpose to say that the Commission did not have the * * * power * * *. * * * Such ancillary powers have always been treated as essential to the effective discharge of the Commission's responsibilities." [30]

Thus it is clear that the Commission has the power to shape remedies which go beyond the simple cease and desist order. Our next inquiry must be whether a corrective advertising order is for any reason outside the range of permissible remedies. Petitioner and *amici curiae* argue that it is because (1) legislative history precludes it, (2) it impinges on the First Amendment, and (3) it has never been approved by any court.

## A. *Legislative History*

Petitioner relies on the legislative history of the 1914 Federal Trade Commission Act [31] and the Wheeler-Lea amendments to it in 1938 [32] for the proposition that corrective advertising was not contemplated. In 1914 and in 1938 Congress chose not to authorize such remedies as criminal penalties, treble damages, or civil penalties, but that fact does not dispose of the question of corrective advertising.[33]

■ Petitioner's reliance on the legislative history of the 1975 amendments to the Act [34] is also misplaced. The amendments

added a new Section 19 to the Act authorizing the Commission to bring suits in federal District Courts to redress injury to consumers resulting from a deceptive practice. The section authorizes the court to grant such relief as it "finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice," including, but not limited to,

> rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice * * *.[35]

Petitioner and *amici* contend that this congressional grant *to a court* of power to order public notification of a violation establishes that the Commission by itself does not have that power.

■ We note first that "public notification" is not synonymous with corrective advertising; public notification is a much broader term and may take any one of many forms.[36] Second, the "public notification" contemplated by the amendment is directed at *past* consumers of the product ("to redress injury"), whereas the type of corrective advertising currently before us is directed at *future* consumers. Third, petitioner's construction of the section runs directly contrary to the congressional intent as expressed in a later subsection: "Nothing in this section shall be construed to affect any authority of the Commission un-

---

**30.** 384 U.S. at 606–607, 86 S.Ct. at 1744.

**31.** 38 Stat. 717 (1914).

**32.** 52 Stat. 111 (1938).

**33.** It is true that one Court of Appeals has relied on this history in concluding that the Commission does not have power to order restitution of ill-gotten monies to the injured consumers. *Heater v. FTC*, 503 F.2d 321 (9th Cir. 1974). But restitution is not corrective advertising. Ordering refunds to *past* consumers is very different from ordering affirmative disclosure to correct misconceptions which *future* consumers may hold. Moreover, the *Heater* court itself recognized this distinction and expressly distinguished corrective advertising,

which it said the Commission is authorized to order, from restitution. 503 F.2d at 323 n.7 and 325 n.13.

**34.** The Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, 88 Stat. 2183 (1975).

**35.** 15 U.S.C. § 57b(b) (Supp. V 1975).

**36.** For example, it might encompass requiring the defendant to run special advertisements reporting the FTC finding, advertisements advising consumers of the availability of a refund, or the posting of notices in the defendant's place of business.

der any other provision of law." [37] Moreover, this intent is amplified by the conference committee's report:

> The section * * * is not intended to modify or limit any existing power the Commission may have to itself issue orders designed to remedying [sic] violations of the law. That issue is now before the courts. It is not the intent of the Conferees to influence the outcome in any way.[38]

We conclude that this legislative history cannot be said to remove corrective advertising from the class of permissible remedies.[39]

### B. *The First Amendment*

■ Petitioner and *amici* further contend that corrective advertising is not a permissible remedy because it trenches on the First Amendment. Petitioner is correct that this triggers a special responsibility on the Commission to order corrective advertising only if the restriction inherent in its order is no greater than necessary to serve the interest involved.[40] But this goes to the appropriateness of the order in this case, an issue we reach in Part IV of this opinion. *Amici curiae* go further, arguing that, since the

Supreme Court has recently extended First Amendment protection to commercial advertising,[41] mandatory corrective advertising is unconstitutional.

■ A careful reading of *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*[42] compels rejection of this argument. For the Supreme Court expressly noted that the First Amendment presents "no obstacle" to government regulation of false or misleading advertising. The First Amendment, the Court said,

> as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely.[43]

In a footnote the Court went on to delineate several differences between commercial speech and other forms which may suggest "that a different degree of protection is necessary * * *." For example, the Court said, they may

> make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.[44]

---

**37.** 15 U.S.C. § 57b(e) (Supp. V 1975).

**38.** Conference Report No. 93–1408, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News at 7774.

**39.** The dissent infers from the 1975 amendments a congressional judgment that the Commission did not already have the power to order corrective advertising. That inference is not justified. See FTC v. Dean Foods Co., 384 U.S. 597, 610, 86 S.Ct. 1738, 1746, 16 L.Ed.2d 802 (1966) (Court will not construe an agency's request for authorizing legislation as affirmative proof of no authority; "[p]ublic policy requires that agencies feel free to ask legislation which will terminate or avoid adverse contentions and litigations"); National Petroleum Refiners Ass'n v. FTC, 157 U.S.App.D.C. 83, 107, 482 F.2d 672, 696 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974) (subsequent grant of congressional authority does not prove agency's prior lack of authority; "it is equally possible that Congress granted the

power out of uncertainty, understandable caution, and a desire to avoid litigation").

**40.** *United States v. Nat'l Society of Professional Engineers,* 555 F.2d 978, 984 (D.C.Cir. 1977); *Beneficial Corp. v. FTC,* 542 F.2d 611, 618–620 (3d Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

**41.** *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

**42.** 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**43.** *Id.* at 772, 96 S.Ct. at 1831. *See also Bates v. State Bar of Arizona,* — U.S. —, —, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

**44.** 425 U.S. at 771–772 n.24, 96 S.Ct. at 1830–31.

The Supreme Court clearly foresaw the very question before us, and its statement is dispositive of *amici's* contention.[45]

### C. Precedents

■ According to petitioner, "The first reference to corrective advertising in Commission decisions occurred in 1970, nearly fifty years and untold numbers of false advertising cases after passage of the Act."[46] In petitioner's view, the late emergence of this "newly discovered"[47] remedy is itself evidence that it is beyond the Commission's authority. This argument fails on two counts. First the fact that an agency has not asserted a power over a period of years is not proof that the agency lacks such power.[48] Second, and more importantly, we are not convinced that the corrective advertising remedy is really such an innovation. The label may be newly coined, but the concept is well established. It is simply that under certain circumstances an advertiser may be required to make affirmative disclosure of unfavorable facts.

One such circumstance is when an advertisement that did not contain the disclosure would be misleading. For example, the Commission has ordered the sellers of treatments for baldness to disclose that the vast majority of cases of thinning hair and baldness are attributable to heredity, age, and endocrine balance (so-called "male pattern baldness") and that their treatment would have no effect whatever on this type of baldness.[49] It has ordered the promoters of a device for stopping bedwetting to disclose that the device would not be of value in cases caused by organic defects or diseases.[50] And it has ordered the makers of Geritol, an iron supplement, to disclose that Geritol will relieve symptoms of tiredness only in persons who suffer from iron deficiency anemia, and that the vast majority of people who experience such symptoms do not have such a deficiency.[51]

Each of these orders was approved on appeal over objections that it exceeded the Commission's statutory authority.[52] The decisions reflect a recognition that, as the Supreme Court has stated,

> If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the

---

**45.** Equally without merit are *amici's* arguments that the order constitutes an unconstitutional taking of property without just compensation and that rulemaking, not adjudication, was the proper vehicle for issuance of such an order.

**46.** Petitioner's br. at 27.

**47.** *Id.* at 29.

**48.** *United States v. Morton Salt Co.*, 338 U.S. 632, 647–648, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *National Petroleum Refiners Ass'n v. FTC, supra* note 39, 157 U.S.App.D.C. at 104–105, 482 F.2d at 693–694.

**49.** *Ward Laboratories, Inc. v. FTC*, 276 F.2d 952 (2d Cir.), *cert. denied*, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); *Keele Hair & Scalp Specialists, Inc. v. FTC*, 275 F.2d 18 (5th Cir. 1960).

**50.** *Feil v. FTC*, 285 F.2d 879 (9th Cir. 1960).

**51.** *J. B. Williams Co. v. FTC*, 381 F.2d 884 (6th Cir. 1967). *Compare Alberty v. FTC*, 86 U.S. App.D.C. 238, 182 F.2d 36, *cert. denied*, 340 U.S. 818, 71 S.Ct. 49, 95 L.Ed. 601 (1950), discussed in note 52 *infra*.

**52.** In *Alberty v. FTC, supra* note 51, this court set aside an order similar to the one upheld in *J. B. Williams Co. v. FTC, supra* note 51. The precise holding of *Alberty* is disputed. Several courts have stated that it held only that the Commission must make an express finding that failure to make disclosure is misleading before it can require such disclosure. *Feil v. FTC, supra* note 50; *Ward Laboratories, Inc. v. FTC, supra* note 49; *Keele Hair & Scalp Specialists, Inc. v. FTC, supra* note 49. To the extent that *Alberty* may have held that the Commission lacked power to order corrective advertising, it has never been followed. The characterization of the required disclosure as "additional interesting, and perhaps useful, information" may or may not have been accurate in *Alberty,* but it grossly understates the case at hand. The disclosure that Listerine does not relieve colds is essential information to correct a widely held, mistaken belief which was cultivated by petitioner's past advertising.

*FTC v. Simeon Management Corp.*, 532 F.2d 708 (9th Cir. 1976), is readily distinguishable on this ground. There an order requiring affirmative disclosure was set aside because there was no evidence that consumers seeing the advertisements formed an incorrect belief or were misled. In short, there was nothing to correct. That is not this case.

narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.[53]

Affirmative disclosure has also been required when an advertisement, although not misleading if taken alone, becomes misleading considered in light of past advertisements. For example, for 60 years Royal Baking Powder Company had stressed in its advertising that its product was superior because it was made with cream of tartar, not phosphate. But, faced with rising costs of cream of tartar, the time came when it changed its ingredients and became a phosphate baking powder. It carefully removed from all labels and advertisements any reference to cream of tartar and corrected the list of ingredients. But the new labels used the familiar arrangement of lettering, coloration, and design, so that they looked exactly like the old ones. A new advertising campaign stressed the new low cost of the product and dropped all reference to cream of tartar. But the advertisements were also silent on the subject of phosphate and did not disclose the change in the product.

The Commission held, and the Second Circuit agreed, that the new advertisements were deceptive, since they did not advise consumers that their reasons for buying the powder in the past no longer applied. The court held that it was proper to require the company to take affirmative steps to advise the public.[54] To continue to sell the new powder

on the strength of the reputation attained through 60 years of its manufacture and sale and wide advertising of its superior powder, under an impression induced by its advertisements that the product purchased was the same in kind and as superior as that which had been so long manufactured by it, was unfair alike to the public and to the competitors in the baking powder business.[55]

In another case [56] the Waltham Watch Company of Massachusetts had become renowned for the manufacture of fine clocks since 1849. Soon after it stopped manufacturing clocks in the 1950's, it transferred its trademarks, good will, and the trade name "Waltham" to a successor corporation, which began importing clocks from Europe for resale in the United States. The imported clocks were advertised as "product of Waltham Watch Company since 1850," "a famous 150-year-old company."

The Commission found that the advertisements caused consumers to believe they were buying the same fine Massachusetts clocks of which they had heard for many years. To correct this impression the Commission ordered the company to disclose in all advertisements and on the product that the clock was not made by the old Waltham company and that it was imported. The Seventh Circuit affirmed, relying on "the well-established general principle that the Commission may require affirmative disclosure for the purpose of preventing future deception." [57]

---

53. *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952) (footnote omitted).

54. The order required Royal to cease using any label which simulated the old familiar label, to incorporate the word "phosphate" as part of the name of the product on all labels and in all advertisements, to cease from representing that the old product had been reduced in price, and to cease from representing that the new product was the baking powder sold by Royal for many years.

55. *Royal Baking Powder Co. v. FTC*, 281 F. 744, 753 (2d Cir. 1922).

56. *Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir.), *cert. denied*, 375 U.S. 944, 84 S.Ct.

349, 11 L.Ed.2d 274 (1963). *See also Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427 (7th Cir.), *cert. denied*, 377 U.S. 992, 84 S.Ct. 1918, 12 L.Ed.2d 1045 (1964).

57. 318 F.2d at 32. *Accord, Ward Laboratories, Inc. v. FTC*, *supra* note 49. The dissent incorrectly states that the Royal and Waltham ads and labels were false on their face (just as selling moonshine in Haig & Haig bottles would be) and that the courts simply ordered the misrepresentations removed. To the contrary, the Royal and Waltham ads and labels were strictly truthful, but they *became* misleading when considered in light of past advertisements. *See* 281 F. at 748–749 and 318 F.2d at 30–31.

It appears to us that the orders in *Royal* and *Waltham* were the same kind of remedy the Commission has ordered here. Like Royal and Waltham, Listerine has built up over a period of many years a widespread reputation. When it was ascertained that that reputation no longer applied to the product, it was necessary to take action to

**58.** In *Royal* and *Waltham* the advertising claims that had given rise to the products' reputations were concededly true when made, but because the products themselves had changed that reputation was no longer deserved. Consumers would have been deceived, in the future, if they had continued to make purchases in reliance upon this reputation. Here, of course, the Commission has determined that Listerine's cold claims were *never* true, and that its reputation as a cold remedy was thus never deserved. What has changed in this case is not the product itself, but the extent of our knowledge of the evidence underlying the advertising claims. But the result here is the same as in the earlier cases—like Royal baking powder or Waltham watches, Listerine continues to enjoy a reputation it does not deserve, and consumers would therefore be deceived if they were to make purchases in reliance upon that reputation.

**59.** We thus find unpersuasive petitioner's contention that the corrective advertising ordered here is unprecedented in that it seeks "to eliminate perceived future effects of past violations that are wholly unrelated to future conduct * * *." Petitioner's br. at 26. We agree with the Commission that the "common thread" linking earlier corrective advertising cases extends to the present case as well. *See* JA 894.

The distinctions petitioner seeks to draw between the present case and earlier corrective advertising cases are essentially semantic. It argues that, unlike *Royal, Waltham,* and similar cases, here the Commission made no specific finding that even truthful future Listerine ads would themselves be deceptive without a corrective statement. Petitioner's br. at 38. Similarly, while petitioner appears to concede that continued *sales* of a product under false pretenses may constitute violation of the FTC Act justifying imposition of corrective advertising, it argues that the Commission offered no evidence to support a finding of such a violation here. Petitioner's br. at 26. It seems clear to us that these various different "theories" are in fact simply different ways of describing the same thing. The nature of the violation, and the nature of the remedy required, are no different whether one says that future truthful *ads* will be "deceptive" when viewed against the

correct it.[58] Here, as in *Royal* and *Waltham*, it is the accumulated impact of *past* advertising that necessitates disclosure in *future* advertising.[59] To allow consumers to continue to buy the product on the strength of the impression built up by prior advertising—an impression which is now known to be false—would be unfair and deceptive.[60]

backdrop of earlier advertising, or that future *sales* to customers who have been misled by earlier advertising will constitute the deceptive practice, or, as the Commission said here, that "there is clear and continuing injury to competition and to the consuming public as consumers continue to make purchasing decisions based on the false belief [that arose from prior deceptive advertisements]." JA 894. The Commission's authority to impose corrective advertising obviously should not turn upon the particular verbal formula chosen in a particular case.

**60.** There is also precedent in other contexts for Commission action to dissipate future effects of a company's past wrongful conduct. In *American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), *after remand*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969), the court approved an order requiring the petitioner to grant patent licenses where he had obtained the patent by illegal conduct. The court said his retention of the fruits of his unlawful conduct would itself be an unfair practice and the Commission had the power to prevent it.

In *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Supreme Court affirmed a judgment that a newspaper publisher, in an effort to destroy a competing radio station, had unlawfully refused to accept advertising from anyone who advertised on the radio station. The Court approved a District Court order requiring the newspaper to publish each week for 25 weeks a conspicuous notice apprising the public of the terms of the judgment. The order was necessary to prevent the newspaper from continuing to reap the benefits of its wrongful conduct.

While we do not know and do not decide whether our petitioner made its false cold claims in good faith or bad, we do observe that for an advertiser who knowingly advertises falsely a simple cease and desist order provides no real deterrent. He has nothing to lose but attorneys' fees. He gets to use the deceptive advertisements until he is caught—more precisely, until Commission proceedings, which usually drag on for years, are completed against him. By the time the order has become final, the particular campaign has probably been squeezed dry, if not already discarded. In

## IV. THE REMEDY

■ Having established that the Commission does have the power to order corrective advertising in appropriate cases, it remains to consider whether use of the remedy against Listerine is warranted and equitable. We have concluded that part 3 of the order should be modified to delete the phrase "Contrary to prior advertising." [61] With that modification, we approve the order.

■ Our role in reviewing the remedy is limited. The Supreme Court has set forth the standard:

The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.[62]

The Commission has adopted the following standard for the imposition of corrective advertising:

[I]f a deceptive advertisement has played a substantial role in creating or reinforcing in the public's mind a false and material belief which lives on after the false advertising ceases, there is clear and continuing injury to competition and to the consuming public as consumers continue to make purchasing decisions based on the false belief. Since this injury cannot be averted by merely requiring respondent to cease disseminating the advertisement, we may appropriately order respondent to take affirmative action designed to terminate the otherwise continuing ill effects of the advertisement.[63]

We think this standard is entirely reasonable. It dictates two factual inquiries: (1) did Listerine's advertisements play a substantial role in creating or reinforcing in the public's mind a false belief about the product? and (2) would this belief linger on after the false advertising ceases? It strikes us that if the answer to both questions is not yes, companies everywhere may be wasting their massive advertising budgets. Indeed, it is more than a little peculiar to hear petitioner assert that its commercials really have no effect on consumer belief.

For these reasons it might be appropriate in some cases to presume the existence of the two factual predicates for corrective advertising.[64] But we need not decide that question, or rely on presumptions here, because the Commission adduced survey evidence to support both propositions. We find that the "Product Q" survey data and the expert testimony interpreting them [65]

---

the meantime the seller has increased his market share and reaped handsome profits. The order to cease making the false claims takes none of this away from him. In short, "[a] cease and desist order which commands the respondent only to 'go, and sin no more' simply allows every violator a free bite at the apple." Note, *"Corrective Advertising" Orders of the Federal Trade Commission*, 85 Harv.L.Rev. 477, 482–483 (1971). *See also* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv.L.Rev. 661, 693–694 (1977); Note, *Corrective Advertising and the FTC: No, Virginia, Wonder Bread Doesn't Build Strong Bodies Twelve Ways*, 70 Mich.L. Rev. 374 (1971).

61. The Federal Trade Commission Act gives the reviewing court the power to "enter a decree affirming, modifying, or setting aside the order of the Commission * * *." 15 U.S.C. § 45(c) (1970).

62. *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612–613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). *See also FTC v. Ruberoid Co., supra* note 53; *Carter Products, Inc. v. FTC*, 268 F.2d 461, 498 (9th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959).

63. JA 894.

64. *See* Pitofsky, *supra* note 60, 90 Harv. L. Rev. at 696–700.

65. The Commission used the results of a series of market surveys known as "Product Q" reports on the "Mouthwash Market." The surveys were conducted by petitioner for its own purposes from 1963 to 1971. According to petitioner's own advertising agency, "Product Q is ideally suited to provide guidance in such vital areas as . * * * [h]ow successful are the current advertising campaigns of different

constitute substantial evidence in support of the need for corrective advertising in this case.

We turn next to the specific disclosure required: "Contrary to prior advertising, Listerine will not help prevent colds or sore throats or lessen their severity." Petitioner is ordered to include this statement in every future advertisement for Listerine for a defined period.[66] In printed advertisements it must be displayed in type size at least as large as that in which the principal portion of the text of the advertisement appears and it must be separated from the text so that it can be readily noticed. In television commercials the disclosure must be presented simultaneously in both audio and visual portions. During the audio portion of the disclosure in television and radio advertisements, no other sounds, including music, may occur.[67]

These specifications are well calculated to assure that the disclosure will reach the public. It will necessarily attract the notice of readers, viewers, and listeners, and be plainly conveyed. Given these safeguards, we believe the preamble "Contrary to prior advertising" is not necessary. It can serve only two purposes: either to attract attention that a correction follows or to humiliate the advertiser. The Commission claims only the first purpose for it, and this we think is obviated by the other terms of the order.[68] The second purpose, if it were intended, might be called for in an egregious case of deliberate deception,[69] but this is not one. While we do not decide whether petitioner proffered its cold claims in good faith or bad, the record compiled could support a finding of good faith.[70] On these facts, the confessional preamble to the disclosure is not warranted.

Finally, petitioner challenges the duration of the disclosure requirement. By its terms it continues until respondent has expended on Listerine advertising a sum equal to the average annual Listerine advertising budget for the period April 1962 to March 1972. That is approximately ten

brands on awareness, recall, attitudes and sales?" JA 2785–2786. The surveys showed that about 70% of the consumers questioned recalled "effective for colds and sore throats" as a main theme of Listerine advertising. During the summer, when no cold claims had been broadcast for about six months, the percentage fell to only 64%; i. e., the recall of cold claims after six months of silence was very substantial. The surveys also showed that about 60% of consumers questioned believed Listerine was "one of the best" mouthwashes for the quality "effective against colds and sore throats." JA 568–580.

The Commission also relied on the testimony of two experts in the field of consumer marketing surveys. Dr. Bass testified that cold efficacy belief levels would continue at about 60% for two years after colds advertising ceased and would remain high after five years. JA 1591–1592, 1617. Dr. Rossi testified that cold efficacy beliefs would decline at no greater a rate than 5% per year. JA 1522, 1556–1559.

**66.** *See* note 1 *supra.*

**67.** JA 865.

**68.** Cf. *United States v. Nat'l Society of Professional Engineers, supra* note 40, 555 F.2d at 984 (order should not be more intrusive than necessary to achieve fulfillment of the governmental interest); *Beneficial Corp. v. FTC, supra* note 40, 542 F.2d at 618–620 (same).

**69.** We express no view on the question whether an order intended to humiliate the wrongdoer would be so punitive as to be outside the Commission's proper authority.

**70.** Petitioner strenuously urges its good faith and offers in support thereof its reliance on the St. Barnabas study which allegedly supported Listerine's claims, *see* text at notes 8–10 *supra,* and on previous "acquittals" by the Commission. The Commission reviewed Listerine's cold claims in 1932, 1940, 1951, 1958, and 1962, and took no action against them. JA 2738–2740.

While good faith may be relevant to the fairness of a confessional preamble, it is irrelevant to the need for corrective advertising in general. Innocence of motive is not a defense if an advertisement is prejudicial to the public interest. As the Supreme Court stated in *FTC v. Algoma Lumber Co.,* 291 U.S. 67, 81, 54 S.Ct. 315, 321, 78 L.Ed. 655 (1934):

Indeed there is a kind of fraud * * * in clinging to a benefit which is the product of misrepresentation, however innocently made. * * * That is the respondents' plight today, no matter what their motives may have been when they began. They must extricate themselves from it by purging their business methods of a capacity to deceive.

(Citations omitted.)

million dollars.[71] Thus if petitioner continues to advertise normally the corrective advertising will be required for about one year. We cannot say that is an unreasonably long time in which to correct a hundred years of cold claims. But, to petitioner's distress, the requirement will not expire by mere passage of time. If petitioner cuts back its Listerine advertising, or ceases it altogether, it can only postpone the duty to disclose.[72] The Commission concluded that correction was required and that a duration of a fixed period of time might not accomplish that task, since petitioner could evade the order by choosing not to advertise at all. The formula settled upon by the Commission is reasonably related to the violation it found.

Accordingly, the order, as modified, is

*Affirmed.*

ROBB, Circuit Judge, dissenting in part:

I agree with the majority that there is substantial evidence in the record to support an order requiring Warner-Lambert to cease and desist from advertising Listerine as a remedy for colds and sore throats. I therefore agree that Parts I, II, IV and V of the Commission's order must be affirmed.

I dissent from the affirmance of Section III of the order which (1) forbids Warner-Lambert to disseminate any advertisement for Listerine unless accompanied by a corrective statement relating to past advertising, and (2) provides that this "duty to disclose the corrective statement shall continue until respondent has expended on Listerine advertising a sum equal to the average annual Listerine advertising budget for the period of April 1962 to March 1972."—a sum of approximately ten million dollars.[1] In my judgment this requirement of corrective advertising is beyond the statutory authority of the Federal Trade Commission. The Commission's authority to enter cease and desist orders is prospective in nature; the purpose of cease and desist orders is "to prevent illegal practices in the future", *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952), not "to punish or to fasten liability on respondents for past conduct". *FTC v. Cement Institute*, 333 U.S. 683, 706, 68 S.Ct. 793, 806, 92 L.Ed. 1010 (1948). The cases that have construed the Commission's remedial power, *e. g., FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 392–93, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *FTC v. Ruberoid Co.,*

71. Petitioner's br. at 56.

72. The ALJ had set the duration of the requirement at two years, but conceded that "[o]ne variable that will have an effect upon what is accomplished is the amount of Listerine advertising respondent may see fit to engage in." JA 585. The Commission's formula takes that variable into account.

1. Section III of the FTC Order contains the corrective advertising requirement. It states in full:

IT IS FURTHER ORDERED that respondent Warner-Lambert Company, a corporation, its successors and assigns, and respondent's officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, do forthwith cease and desist from disseminating or causing the dissemination of any advertisements for the product Listerine Antiseptic unless it is clearly and conspicuously disclosed in each such advertisement in the exact language below that:

Contrary to prior advertising, Listerine will not help prevent colds or sore throats or lessen their severity.

In print advertisements, the disclosure shall be displayed in type size which is at least the same size as that in which the principal portion of the text of the advertisement appears and shall be separated from the text so that it can be readily noticed. In television advertisements, the disclosure shall be presented simultaneously in both the audio and visual portions. During the audio portion of the disclosure in television and radio advertisements, no other sounds, including music, shall occur. Each such disclosure shall be presented in the language, *e. g.*, English, Spanish, principally employed in the advertisement.

The aforesaid duty to disclose the corrective statement shall continue until respondent has expended on Listerine advertising a sum equal to the average annual Listerine advertising budget for the period of April 1962 to March 1972.

86 F.T.C. 1398, 1485–86 (1975).

*supra; FTC v. National Lead Co.*, 352 U.S. 419, 428–29, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 610–12, 66 S.Ct. 758, 90 L.Ed. 888 (1946), stand only for the proposition that the Commission has broad discretion in determining what conduct of a respondent shall be forbidden prospectively. I think this authority does not encompass the power to employ the retrospective remedy of corrective advertising; and I find no other basis for that asserted power.

As the majority recognizes, Congress by amendment of the Federal Trade Commission Act in 1975 authorized the Commission to commence civil actions in federal district courts, to remedy unfair or deceptive acts or practices "with respect to which the Commission has issued a final cease and desist order". As part of the relief granted in such an action the court was given the power to order "public notification respecting the . . . unfair or deceptive acts or practices". So far as pertinent the amendment reads as follows:

> (2) If any person, partnership, or corporation engages in any unfair or deceptive act or practice (within the meaning of section 45(a) of this title) *with respect to which the Commission has issued a final cease and desist order* which is applicable to such person, partnership, or corporation, then the Commission may commence a civil action against such person, partnership, or corporation in a United States district court or in any court of competent jurisdiction of a State. *If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b) of this section.*

> (b) The court in an action under subsection (a) of this section shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or

practice, as the case may be. Such relief may include, but shall not be limited to, recission or reformation of contracts, the refund of money or return of property, the payment of damages, and *public notification* respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

15 U.S.C. § 57b(a)(2) and 57b(b). [Emphasis supplied]

The majority comments briefly that the 1975 Amendment "cannot be said to remove corrective advertising from the class of permissible remedies"; the expressed "congressional intent", says the majority, is to the contrary. I think the 1975 legislation cannot be so lightly dismissed. The amendment indicates to me that at least in the judgment of the Congress the Commission does not have, and is not intended to have, the power to order "public notification" by way of corrective advertising. If the Commission already had that power, why was the amendment necessary? Moreover, the majority fails to note that under the amendment a district court can order public notification only on a showing that the respondent acted in bad faith. Yet the theory of the Commission, accepted by the majority, is that the Commission may enter a corrective advertising order even though a false advertisement was published in good faith. To me it is strange that the Congress would require a court to find bad faith, while authorizing the Commission to act in the absence of bad faith.

The majority attempts to distinguish "public notification" from corrective advertising. First, says the majority, "public notification is a much broader term" than corrective advertising. It is clear to me however that the term public notification includes corrective advertising of the type ordered in this case. Indeed, the examples of public notification given by the majority (n.36) are simply variations of corrective

advertisements.[2] Second, the majority says "the 'public notification' contemplated by the amendment is directed at *past* consumers of the product . . . whereas the type of corrective advertising currently before us is directed at *future* consumers." [Emphasis in original] I think the term "public notification" must not be construed so narrowly that future consumers are ignored.

My view of the significance of the amendment is buttressed by the statement of Senator Moss, a co-sponsor of the bill, 120 Cong.Rec. 40712 (1974): "The Federal Trade Commission's improvements specified in the bill will afford, in my opinion, long-term improvement in the fairness of the American marketplace. No longer will the Federal Trade Commission be confined to slapping the wrists of persons who engage in unfair or deceptive practices and telling them not to do it again."

The majority relies upon the statement in the Conference Committee's report and the provision in the amendment to the effect that it does not affect any "existing power" of the Commission. S.Rep. No. 93–1408, 93d Cong., 2d Sess. 1974, reprinted in [1974] U.S.Code Cong. & Ad.News 7774; 15 U.S.C. § 57b(e). The majority seems to think these statements indicate a congressional intent to give the Commission authority to order corrective advertising. I am unable to understand this reasoning. The question before us is what is the "existing power" of the Commission, and that question is not answered by either the amendment or the Committee's report.

I find nothing in the cases that justifies the Commission's corrective advertising order. In particular, I am not persuaded by the majority's quotations from the opinions of the Supreme Court in *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), and *FTC v. Dean Foods Co.*, 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). Taken in the context of the facts of those cases the quoted language does not support the majority's conclusion.

In the *Pan American* case the Court considered the power of the Civil Aeronautics Board under section 411 of the Civil Aeronautics Act of 1958, 49 U.S.C. § 1381, to order an air carrier to cease and desist from "unfair . . . practices or unfair methods of competition". The Court held that the Board's jurisdiction over unfair practices and unfair methods of competition, together with its power under the Act to regulate air carriers, and to deal with consolidations, mergers, interlocking relations, pooling arrangements, etc., 49 U.S.C. §§ 1378, 1379, and its authority to enforce the Clayton Act as it is applicable to air carriers, 15 U.S.C. § 21, empower the Board to order divestiture when a combination between carriers violates the antitrust laws and hinders the Board's restructuring of routes. Considered in the light of the specific and extensive statutory underpinning upon which the Court based this decision it is a far cry from a holding that the power to order divestiture was derived only from the authority to issue cease and desist orders, as the majority opinion suggests.[3] Certainly it does not follow from this case

2. As one example of "public notification" the majority says in n.36 "it might encompass requiring the defendant to run special advertisements reporting the FTC finding . . .." I note however that according to the FTC such advertisements are "corrective advertising". In its opinion in the case before us, 86 F.T.C. 1398, 1498 (1975) the Commission states that it "has accepted numerous consent orders which require corrective advertising." In support of this statement the Commission cites several cases as examples of cases in which corrective advertising was ordered. (*Id.*, pp. 1498–99, n.22) In at least three of those cases the Commission required the respondent to publish ad-

vertisements advising the public of the FTC finding and retracting prior deceptive statements. *Pay Less Drug Stores Northwest, Inc.*, 82 F.T.C. 1473 (1973); *Boise Tire Co.*, 83 F.T.C. 21 (1973); *Wasem's, Inc.*, 84 F.T.C. 209 (1974).

3. Compulsory licensing of an illegally obtained patent, referred to in the majority's n.60, is an aspect of divestiture. A legally obtained patent permits a valid monopoly for the period of the patent; an illegally obtained patent shelters an invalid monopoly which can be "broken up" by requiring the patent holder to license its patent to competitors.

that the power of the Federal Trade Commission to order corrective advertising can be derived from its authority to issue cease and desist orders, standing alone.

For similar reasons the language quoted by the majority from the *Dean Foods* case is not persuasive. As stated by the Supreme Court the issue in that case was:

> . . . the power of the Court of Appeals under the All Writs Act, 28 U.S.C. § 1651(a) (1964 ed.), to temporarily enjoin the consummation of a merger that is under attack before the Federal Trade Commission as violative of § 7 of the Clayton Act, as amended, 64 Stat. 1125, 15 U.S.C. § 18 (1964 ed.).

*Id.* at 599, 86 S.Ct. at 1740. The Court noted that the Clayton Act granted the Commission the power to determine the legality of a merger and to order divestiture if it proved to be appropriate, 15 U.S.C. § 21(b); and the Court therefore held that the Commission might apply to a court of appeals for a preliminary injunction to maintain the status quo until the Commission decided the matter and the court of appeals reviewed the Commission's decision. The power to pray for an injunction was described by the Supreme Court as "incidental" to the Commission's authority under the Clayton Act. *Id.* at 606, 86 S.Ct. 1738. To deny this plainly incidental power to preserve the Commission's and the court's jurisdiction, said the Supreme Court, "would stultify congressional purpose." Here again I think this decision does not support the majority's leap to the conclusion that the power to issue a cease and desist order, without more, authorizes the Commission to enter a corrective advertising order, nor does the decision justify a conclusion that the corrective order can be sustained under some general remedial power of the Commission.

The other cases cited by the majority do not justify the Commission's order. In those cases an affirmative disclosure was required because failure to reveal material facts, in the light of the representations made in advertisements, made them misleading. Thus in the case of *Ward Labora-*

*tories, Inc. v. FTC,* 276 F.2d 952 (2d Cir.), *cert. denied,* 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960), cited by the majority, the court said:

> Any requirement of an affirmative disclosure of a negative is always to be approached with caution. Merely because a remedy is useful for any one ailment is no reason to demand an accompanying statement of all the ills for which it is not beneficial. Even this principle, however, must yield *where the advertisements are misleading because of failure to reveal facts material in the light of the representations made therein. In arriving at such a conclusion the advertisements (format and copy) and the potential customer they are intended to reach must be analyzed.*

*Id.* at 954. [Emphasis supplied]

Similar reasoning may be found in *Keele Hair & Scalp Specialists, Inc. v. FTC,* 275 F.2d 18 (5th Cir. 1960); *Feil v. FTC,* 285 F.2d 879 (9th Cir. 1960); and *J. B. Williams Co. v. FTC,* 381 F.2d 884 (6th Cir. 1967).

In *Royal Baking Powder Co. v. FTC,* 281 F. 744 (2d Cir. 1922), relied upon by the majority, a manufacturer by employing false and misleading labeling and advertising represented that a phosphate baking powder which it was offering for sale was the same as the more expensive cream of tartar baking powder which it had manufactured for many years. The baking powder company was in the position a liquor dealer would be in today if he used Haig & Haig pinch bottles and labels when purveying moonshine whiskey. The court held that the Commission properly ordered the company, by correcting its false and misleading advertising, to cease and desist from this unfair method of competition. In *Waltham Watch Co. v. FTC,* 318 F.2d 28 (7th Cir.), *cert. denied,* 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 274 (1963), an advertisement represented that clocks offered for sale were manufactured by a "famous 150-year-old company", the original Waltham Watch Company of Massachusetts. The fact was that the original Waltham Company had nothing to do with the clocks of-

fered for sale, which were imported from Europe. The Commission ordered the advertisers to cease and desist from using the name Waltham in connection with the sale of clocks unless the public was warned that they were not manufactured by the Waltham Watch Company in Waltham, Massachusetts.

The majority finds "that the orders in *Royal* and *Waltham* were the same kind of remedy the Commission has ordered here". I cannot agree. In those cases advertisements falsely represented that the products offered for sale were the same as the products, well-known to the public, which had been offered in the past. The Commission's orders simply required these false representations to be corrected in future advertisements using the same or similar format or copy. In the present case, however, when Warner-Lambert has ceased and desisted from advertising Listerine as a remedy for colds and sore throats there will be nothing to correct in the text of the Listerine advertisements. Any "corrective statement" will relate solely to past advertising.

Finally, in considering the validity of the Commission's order the majority fails to focus on all its terms. Section III of the order forbids *any* advertisements for Listerine without the corrective statement. Yet it is conceded that Listerine is effective as a mouth wash and breath freshener, and it appears that in recent years much the greater part of Warner-Lambert's advertising budget for Listerine has been spent in promoting these uses of the preparation. Thus the Commission and the majority would forbid the publication of truthful advertisements of Listerine's effectiveness unless coupled with a disclaimer relating to uses advertised in the past. I cannot believe that the statute contemplates such a remedy, which goes far beyond the prevention of "illegal practices in the future."

The theory of the majority is that whenever "advertisements play a substantial role in creating or reinforcing in the public's mind a false belief about [a] product" and "this belief [may] linger on after the false advertising ceases", corrective advertising may be ordered. As the majority apparently concedes, this test would apply to almost any advertisement which is the subject of a cease and desist order. I cannot accept this concept. I reject the proposition that the after-effects of advertising which has been discontinued pursuant to a cease and desist order can thus expand the Commission's statutory power to prevent future illegal practices. *See Heater v. FTC,* 503 F.2d 321, 323–25 (9th Cir. 1974). In my opinion such an expansion must be made by the Congress, not by this court.

## SUPPLEMENTAL OPINION ON PETITION FOR REHEARING

In its petition for rehearing petitioner has urged this court to reconsider its earlier decision affirming, with some modifications, the order of the Federal Trade Commission requiring Warner-Lambert Company to cease and desist from deceptively advertising its product Listerine as a cure for colds or sore throat and affirmatively to correct in its future advertisements the impression created by its prior deceptive advertising. The primary argument raised in the petition for rehearing is that the Commission is barred by the First Amendment from imposing a corrective advertising order in this case. Having considered this claim carefully, it is our conclusion that it must be rejected. Because of the importance of the issues raised, however, we think it desirable to set forth in some detail our reasons for so concluding.

I

In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Supreme Court rejected prior precedents holding that commercial speech is "wholly outside the protection of the First Amendment." *Id.* at 761, 96 S.Ct. at 1825. In reaching this conclusion the Court emphasized the interest of consumers in the free flow of truthful information necessary for formulation of intelligent opinions and proper resource allocation. *Id.* at 764–765, 96 S.Ct. 1817. Consistent with this concern,

the Court was careful to distinguish truthful commercial speech from that which is false, misleading, or deceptive: "Untruthful speech, commercial or otherwise, has never been protected for its own sake. * * * Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem." *Id.* at 771, 96 S.Ct. at 1830 (citations and footnote omitted). Furthermore, the Court went on to suggest that, because of the "commonsense differences" between commercial speech and other varieties, even commercial speech subject to First Amendment protections may nonetheless enjoy a "different degree of protection" than that normally accorded under the First Amendment. *Id.* at 771–772 n.24, 96 S.Ct. 1817.

◼ Applying these principles to the case at bar, there can be no question of the legitimacy of the FTC's role in regulating and preventing false and deceptive advertising. In this case it has been found that Warner-Lambert has, over a long period of time, worked a substantial deception upon the public; it has advertised Listerine as a cure for colds, and consumers have purchased its product with that in mind. That the Commission has authority to prohibit Warner-Lambert from continuing to make such false and deceptive claims in its advertisements is not disputed, for it is only truthful claims which are protected under the First Amendment.[1] Here, however, the FTC has determined on substantial evidence that the deception of the public occasioned by Warner-Lambert's past advertisements will not be halted by merely requiring Warner-Lambert to cease making such claims in the future. To be sure, current and future advertising of Listerine, when viewed in isolation, may not contain any

statements which are themselves false or deceptive. But reality counsels that such advertisements cannot be viewed in isolation; they must be seen against the background of over 50 years in which Listerine has been proclaimed—and purchased—as a remedy for colds. When viewed from this perspective, advertising which fails to rebut the prior claims as to Listerine's efficacy inevitably builds upon those claims; continued advertising continues the deception, albeit implicitly rather than explicitly.[2] It will induce people to continue to buy Listerine thinking it will cure colds. Thus the Commission found on substantial evidence that the corrective order was necessary to "dissipate the effects of respondent's deceptive representations." FTC op. at 41, JA 907.

Under this reasoning the First Amendment presents no direct obstacle. The Commission is not regulating truthful speech protected by the First Amendment, but is merely requiring certain statements which, if not present in current and future advertisements, would render those advertisements themselves part of a continuing deception of the public. As the Supreme Court recognized in *Virginia State Board*, in some cases it may be "appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive." 425 U.S. at 772 n.24, 96 S.Ct. at 1830–31. We must conclude—as did the Commission—that this is such a case.

II

◼ Admittedly, corrective advertising orders such as that imposed here may give

---

1. Cease and desist orders aimed at false or deceptive speech may, in theory, have a chilling effect on truthful speech, and be subject to First Amendment scrutiny on that account. In practice, however, this should rarely if ever be necessary. *See* Part II *infra.*

2. In this connection it is worth noting that Warner-Lambert currently advertises Liste-

rine's ability to kill germs that cause bad breath. While we have no reason to doubt the truth of this claim, the emphasis on Listerine's germ-killing ability does seem to tie in closely with prior false advertising as to its capacity to alleviate health problems. *See* FTC op. at 38 n.28, JA 904.

rise to concern as to their chilling effect on protected truthful speech. The potential advertiser must consider not only the possibility that he will be forced, at some future date, to abandon his advertising campaign, but also that he may be required to include specific disclaimers in future advertisements. But this danger seems more theoretical than real. As the Supreme Court pointed out in *Virginia State Board*, not only is the truth of commercial speech "more easily verifiable by its disseminator" than other forms of speech, but "[s]ince advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely." 425 U.S. at 771–772 n.24, 96 S.Ct. at 1830.

Moreover, whatever incremental chill is caused by a corrective advertising order beyond that which would result from a cease and desist order may well be necessary if the interest of consumers in truthful information is to be served at all. Otherwise, advertisers remain free to misrepresent their products to the public through false and deceptive claims, knowing full well that even if the FTC chooses to prosecute they will be required only to cease an advertising campaign which by that point will, in all likelihood, have served its purpose by deceiving the public and already been replaced. *See* panel majority op. at —— n.60, 562 F.2d at 761 n.60; Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv. L.Rev. 661, 692–693 & nn.129–130 (1976) (emphasizing the relatively small number of complaints issued by the FTC each year and the lengthy time period between complaints and orders); Note, *"Corrective Advertising" Orders of the Federal Trade Commission*, 85 Harv.L.Rev. 477, 482–483 (1973).

**3.** *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 779–781, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (Stewart, J., concurring); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 69 n.32, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); Note, *First Amendment Protection for Commercial Advertising: The New Constitutional*

## III

■ A more serious First Amendment problem which may be raised by corrective advertising orders involves the burden thereby imposed upon the constitutional right recognized in *Virginia State Board* to advertise truthfully: the party subject to a corrective advertising order may be precluded from exercising his right to advertise unless he also includes specified statements undermining his prior deceptive claims. On the facts of this case, no burden is imposed upon truthful, protected advertising since, as the Commission makes clear, Listerine's current advertising, if not accompanied by a corrective message, would itself continue to mislead the public. Even if, in the circumstances of this case, the current and future advertising of Listerine is considered constitutionally protected speech, however, we think the corrective advertising order in this case remains appropriate.

The Supreme Court, in invalidating the state ban on advertising of prescription drug prices in *Virginia State Board*, considered the scope of the restriction on First Amendment rights, the governmental purposes and public interests affected by the ban, and the availability of alternative means to accomplish the legitimate governmental objectives. *See* 425 U.S. at 764–770, 96 S.Ct. 1817. *See also Bates v. State Bar of Arizona,* —— U.S. ——, —— – ——, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). As we have indicated, it is not at all clear, even after *Virginia State Board*, that commercial speech protected by the First Amendment is, apart from "commonsense differences," entitled to the same degree of protection as other forms.[3] Indeed, the opposite conclusion seems the more appropriate one.[4] But in any event, it does seem clear that the corrective advertising order in this case is the least restrictive means of achieving a

*Doctrine,* 44 U.Chi.L.Rev. 205, 225 n.121 (1976).

**4.** *Cf. Banzhaf v. FCC,* 405 F.2d 1082, 1101–1103 (D.C.Cir. 1968), *cert. denied, sub nom. Tobacco Institute, Inc. v. FCC,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

substantial and important governmental objective and that, on balance, it must be upheld.[5] *Cf. Buckley v. Valeo*, 424 U.S. 1, 25–29, 65–68, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The governmental interest here, of course, is in protecting citizens against deception—with its attendant waste and misallocation by consumers to the benefit of the wrongdoers—by ensuring that advertising conveys truthful information to the public. As we noted earlier, it is this very interest which was invoked by the *Virginia State Board* Court as support for its conclusion that commercial speech is protected by the First Amendment. *See* 425 U.S. at 764–765, 96 S.Ct. 1817. *See also Bates v. State Bar of Arizona, supra,* —— U.S. at ——, 97 S.Ct. 2691.

And the facts of this case make it eminently clear that this interest will not be substantially served by the less restrictive remedy—a cease and desist order. Whatever one may conclude as to the effect of Warner-Lambert's long history of deception on the protected status of its current advertising, we see no basis—and none has been offered—for questioning the Commission's conclusion that, absent a corrective remedy, consumers will continue to purchase Listerine as a cure for colds. *See* FTC op. at 38, JA 904. Indeed, at least one advocate of corrective advertising has urged that such orders not be confined to obvious cases such as *Warner-Lambert* where the proof

presented to the Commission of the success of a deceptive campaign is so striking. Noting the long history of a deceptive claim uniquely asserted for Listerine, the absence of consumer confusion as to which mouthwash was effective against colds, and the persuasive evidence that this claim was believed by consumers after the false advertising had ceased, Professor Pitofsky has argued that "[c]omparable proof of deception-perception-memory influence would be virtually impossible in most advertising cases. * * * If the Commission is to do an effective job in regulating deceptive advertising, corrective advertising must apply to more than the one-in-a-million type of ad campaign present in *Warner-Lambert.*" *See* Pitofsky, *supra*, 90 Harv.L.Rev. at 698.

Finally, the corrective advertising order in this case, by tying the quantity of correction required to the investment in deception, is tailored to serve the legitimate governmental interest in correcting public misimpressions as to the value of Listerine—and no more.[6] Taking all these factors into account, we think it beyond doubt that the FTC order is a valid one.

*Petition for rehearing denied.*

ROBB, Circuit Judge, dissenting:

I adhere to the view expressed in my dissent that the corrective advertising order imposed on Warner-Lambert goes beyond the statutory authority of the Federal Trade Commission. Accordingly, so far as that order is concerned I find it unnecessary to reach the constitutional question dis-

5. We do not here consider whether the Commission, under principles of administrative exhaustion, should be required initially to decide this constitutional issue in light of the decision in *Virginia State Board.* The extent to which administrative exhaustion of constitutional claims is required presents difficult and unsettled questions of law, and since this point has been neither raised nor briefed by petitioner, we decline to address it in this decision. *See Mathews v. Eldridge*, 424 U.S. 319, 327–330, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 764–767, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); K. Davis, Administrative Law of the Seventies §§ 20.00 to 20.00–3 (1977 Supp.); Note, *The Authority of Administrative*

*Agencies to Consider the Constitutionality of Statutes*, 90 Harv.L.Rev. 1682 (1977).

6. As the Commission itself noted, it may well be impossible to "determine in advance with computer-like precision the minimum amount of corrective advertising which will dispel otherwise continuing beliefs at issue." FTC op. at 39, JA 905. Even so, considering the 50 years of deceptive Listerine advertising, continuing inflation with attendant increased advertising costs leaves no doubt that the Commission is requiring a significantly smaller quantity of corrective advertising than prior deceptive advertising. As a result, any imprecision in the order's scope would seem likely to inure to Warner-Lambert's benefit.

cussed by the majority. I would set aside the corrective advertising portion of the Commission's order.